IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BILLY D. WILLIAMS,

                Plaintiff,

  v.                                                              OPINION and ORDER

JUDI FIELDS, RENEE A. SCHUELER, JEANIE M.                              23-cv-545-jdp
KRAMER, and TINA R. TYLER,

                Defendants.

---

Plaintiff Billy D. Williams, proceeding without counsel, alleges that medical staff at Dodge Correctional Institution (DCI) and Racine Correctional Institution (RCI) ignored his need for orthopedic shoes for foot problems caused by diabetes and denied him medical care for a toe wound that led to the toe's amputation. Williams is proceeding on Eighth Amendment medical care and Wisconsin-law medical negligence claims.

The state-employed defendants (Judi Fields, Renee A. Schueler, and Jeanie M. Kramer) and defendant Tina R. Tyler separately move for summary judgment. Dkt. 34 and Dkt. 36. The undisputed facts show that Williams's primary care provider at DCI, Fields, declined to order diabetic shoes based on her medical judgment that Williams did not qualify for them, and that Schueler, as a nurse, lacked the authority to order diabetic shoes. The undisputed facts also show that Williams's provider at RCI, Kramer, took reasonable measures to address his diabetes and toe wound, and that Nurse Tyler took prompt action after Williams complained of worsening pain and other symptoms by referring him to Kramer, who treated him. I will grant defendants' motions and close the case.

UNDISPUTED FACTS

Williams was incarcerated at DCI from February to August 2020, and at RCI from August 2020 until his March 2023 release. Fields was an advanced practice nurse prescriber (APNP) at DCI, and Schueler was a nurse at DCI. Kramer was an APNP at RCI, and Tyler was a nurse at RCI, employed through a medical staffing agency.

On February 26, 2020, Schueler conducted Williams's intake examination at DCI. Schueler says that Williams told her that he had diabetes but he did not ask for diabetic shoes or complain of foot pain. Dkt. 40 ¶¶ 7–8, 11. Schueler also says that if Williams had complained of foot pain or asked for diabetic shoes, she would have made those notations in his medical chart. *Id.* ¶¶ 7, 10. Williams does not dispute that Scheuler would have made those notations if he had asked for diabetic shoes or complained of foot pain. Dkt. 47 ¶¶ 20, 23. But in his verified complaint, which I treat as a declaration, Williams says that he told Schueler that he could not wear state-issued work boots because they made his feet sore, and that he needed "specially fitted shoes." Dkt. 1 at 4. As a nurse, Schueler did not have the authority to order Williams diabetic shoes; Fields would have to make that order. Dkt. 47 ¶ 24.

On March 3, 2020, Fields saw Williams for a further intake appointment and conducted a diabetes foot exam. Williams had small fissures in dry skin on both heels, so she ordered petroleum jelly to promote healing. Fields noted no redness, lesions, swelling, or gross deformities in Williams's extremities, and that his diabetes was well controlled. Fields started Williams on the diabetic medication glipizide to stimulate the release of insulin. Fields also noted that Williams had diabetic shoes during his prior incarceration and that she would look into whether he could be evaluated for custom orthotics.

Williams says that he told Fields that he had diabetes and that his state-issued boots always caused him pain, and that he had specially fitted shoes during his prior incarceration. Dkt. 1 at 4. Williams does not dispute, however, that he did not qualify for diabetic shoes at the March 3 visit because he did not have any deformity, lesions, or open areas on either foot, and because his monofilament sensation was intact on both feet. *See* Dkt. 47 ¶ 33.

In mid-March 2020, Nurse Jennifer Peters noted that Williams had developed a blister on his right big toe but lacked any signs of infection. Peters told Williams to notify the health services unit (HSU) of any signs of infection, and she issued Velcro shoes as a short-term solution until Williams received permanent diabetic shoes.

Later that month, Nurse Angela Polensky saw Williams and noted an open area on his right big toe. Polensky asked Fields to evaluate the wound, and Fields ordered an X-ray, the antibiotic Keflex as a precaution, and wound care. The X-ray was negative.

In mid-April 2020, Fields told Nurse Kay Walsh that Williams had reached a healing plateau with his wound. But later that month, Nurse Joni Dykstra noted that Williams had an open sore with calloused edges on the bottom of his right big toe. Fields directed nursing staff to apply collagen, antimicrobial dressing, and gauze wrap until the end of April. Fields also directed Medical Program Assistant Associate (MPAA) Tracy Rudack to expedite an appointment with an outside podiatrist to see if greater care was necessary.

Around that time, Holly Gunderson, a Department of Corrections-certified wound care specialist, had a telehealth visit with Williams. Gunderson noted that Williams's blood sugar was well controlled and that he was using a wheelchair. Gunderson also noted that Williams's wound had no signs of infection, but she recommended daily wound care and weekly wound evaluations. Gunderson also recommended diabetic shoes from Orthofeet, and that Williams

receive a post-op shoe in the meantime. A post-op shoe has an open front and adjustable straps, features that help protect a foot wound while it heals or when a bulky dressing makes wearing a regular shoe difficult. Williams received a post-op shoe that day, and Fields ordered diabetic shoes. Fields also prescribed the antibiotic doxycycline, which is commonly used for diabetic foot infections.

On April 30, 2020, outside podiatrist Dr. Jonathan Stroebel saw Williams and debrided his wound. Stroebel instructed Williams to continue dressing the wound and wearing the post-op shoe. The next day, Fields ordered more wound care, including the application of collagen to Williams's right toe. Williams received diabetic shoes a few days later. Williams received wound care throughout May.

In late May, Stroebel saw Williams and debrided his wound. Stroebel instructed Williams to continue dressing the wound daily and using the post-op shoe, which Stroebel modified to reduce pressure on his toe.

In June and July 2020, Williams cleaned and wrapped his wound by himself. Wound checks conducted by nursing staff in this period did not reveal any irregularities with the wound.

In late July 2020, Fields conducted a diabetes foot exam and noted an ulcer on the bottom of Williams's right big toe. Fields wrote that his diabetes was not well controlled. She increased his glipizide and ordered diagnostic testing, weekly wound assessments, and a podiatry consultation. The X-ray was negative. MPAA Wolf notified Fields that Wolf scheduled the podiatry consultation for September 11, 2020. Dkt. 41-1 at 654.

Williams was transferred to RCI on August 14, 2020. A nurse at RCI, Rozetta Hughes-Richards, canceled the podiatry consultation and required a new referral from an RCI provider. *See* Dkt. 42-2 at 1; Dkt. 47 ¶ 174.

On August 25, 2020, upon reviewing Williams records, defendant APNP Kramer entered a high-priority appointment with HSU staff because Williams had a nonhealing diabetic ulcer. Between August 29 and September 9, 2020, HSU staff received at least five health service requests (HSRs) from Williams in which he requested a provider and wound care for his toe. *See* Dkt. 42-1.

Hughes-Richards saw Williams on August 29, 2020. Hughes-Richards gave Williams supplies for wound care and consulted with Dr. Phillip Wheatley, who recommended another X-ray and a visit with Williams's provider. The X-ray was negative.

On September 3, 2020, defendant Nurse Tyler saw Williams in response to an HSR in which he wrote that he had foot and leg pain and needed a doctor to treat his toe. Dkt. 42-1 at 4. Tyler noted that the ulcer was swollen and had bloody drainage, and that Williams's blood pressure was elevated. Tyler also noted that Williams had no signs of infection, and she asked Kramer to evaluate him. Williams says that even though his wound smelled bad and the dressing was sordid, Tyler told him to use the dressing for three days until Kramer could see him. Dkt. 1 at 6–7.

But Kramer saw Williams that day. Kramer provided a variety of care, including: (1) cleaning and dressing Williams's wound; (2) reordering his collagen matrix dressing; (3) ordering dressing changes three times weekly for two weeks; (4) ordering daily blood pressure monitoring; (5) ordering blood glucose checks three times weekly; (6) ordering his placement on the list for offsite appointments with podiatry and prosthetics to see if his

footwear was appropriate; and (7) ordering Tylenol for pain. Dkt. 147 ¶¶ 146–47, 149, 176. Kramer also asked Williams if he wanted to start insulin at that time, which he declined. Tyler changed Williams's wound dressing the next day.

On September 9, 2020, Nurse Stephen McCullen saw Williams for wound care. McCullen noted that Williams's toe was red and swollen, and that his wound was almost one centimeter deep. McCullen told Kramer that Williams's wound had regressed and Kramer ordered daily wound dressing, an offloading boot, paring the callous, and frequent podiatry visits.

Kramer saw Williams the following day. Williams expressed concerned about the increased drainage in his wound, and he requested an expedited podiatry consultation. Kramer ordered that the podiatry and prosthetics consultations be scheduled as high priorities. Kramer also examined Williams's toe and cleaned and redressed the area. In addition, Kramer ordered that Williams change his dressing daily until he followed up with her five days later. Williams says that he told Kramer that the wound could result in limb loss because it had a foul odor and was causing him intense pain that had reached his groin. Dkt. 1 at 8.

On September 14, 2020, Kramer saw Williams. Kramer noted that Williams's ulcer appeared to be improving. But because the wound bed was too moist for optimal healing, Kramer changed the plan of care to Betadine twice daily, and to lightly fill the wound with iodoform packing strips. Kramer did not order antibiotics because she thought that the increased odor and drainage could be addressed with more frequent dressing changes. Kramer learned that day that the MPAA hadn't scheduled the appointment and that high priority podiatry appointments were not available. But Kramer reiterated to the MPAA that Williams needed to be seen by a podiatrist as soon as possible for aggressive callus debridement. Kramer

6

also placed an order for an offloading shoe to help take pressure off Williams's foot. Kramer noted that she would wait for podiatry's recommendations. The next day, Kramer recleaned and redressed Williams's wound, and she noted no signs or symptoms of an infection.

A day later, Williams was seen by an offsite podiatrist, Dr. Anne Stroze. Stroze determined that Williams had developed osteomyelitis, and she recommended that his toe be amputated within two weeks. Williams was hospitalized later that evening with worsening symptoms and the surgeon immediately removed his toe.

ANALYSIS

A.  **Federal medical care claim**

Williams alleges that Schueler and Fields ignored his need for diabetic shoes, and that Tyler and Kramer denied him necessary medical care for his toe wound. The Eighth Amendment prohibits prison officials from consciously disregarding the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prove a medical care claim, Williams must show that he had an objectively serious medical condition that defendants consciously disregarded. *See Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017). Defendants don't dispute that Williams had serious medical needs for appropriate footwear and adequate treatment for his toe wound. The issue is whether defendants consciously disregarded Williams's serious medical needs.

Conscious disregard requires that defendants are subjectively aware of that need. *See id.* That means that defendants knew of facts from which the inference could be drawn that a substantial risk of serious harm existed, and they actually drew that inference. *Farmer v.*

*Brennan*, 511 U.S. 825, 837 (1994). Conscious disregard involves intentional or reckless conduct, not mere negligence. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

The Eighth Amendment entitles prisoners to "adequate medical care," that is, "reasonable measures to meet a substantial risk of serious harm." *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). The Eighth Amendment doesn't require "specific care" or "the best care possible." *Id.*; *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Disagreement between Williams and defendants, or among medical professionals, about the proper course of treatment isn't enough to show conscious disregard. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996).

Ignoring a prisoner's request for medical assistance outright can be enough to show conscious disregard of medical needs. *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc). If a medical professional has provided some care for a prisoner's condition, she consciously disregards the serious medical need only if her care is so inadequate that it demonstrates an absence of professional judgment, that is, that no minimally competent professional would have responded in that way in the circumstances. *See Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021); *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998). The key question is whether the medical professional based her treatment decision on her medical judgment. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021).

There is also a causation requirement under 42 U.S.C. § 1983. *Ortiz v. City of Chicago*, 656 F.3d 523, 539 (7th Cir. 2011). To prevail, Williams must show not only that defendants denied him medical care, but also that the denial actually injured him. *See Lord v. Beahm*, 952

F.3d 902, 905 (7th Cir. 2020); *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019).

1. **Medical care claim against Schueler**

Williams is proceeding against Schueler based on the allegations that, during the visit on February 26, 2020, Schueler failed to act in response to his request for specially fitted shoes, and that his failure to receive those shoes contributed to the development of his toe wound. Dkt. 1 at 4; Dkt. 5 at 4. For both Schueler and the other defendants, I will not consider arguments for relief that are outside the scope of the claims on which I allowed Williams to proceed. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

Schueler cannot be liable under 42 U.S.C. § 1983 "if the remedial step was not within [her] power." *See Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012). The basic rule is that a nurse is entitled to defer to a doctor's medical judgment. *See Pulera v. Sarzant*, 966 F.3d 540, 553 (7th Cir. 2020).

I will assume for purposes of this opinion that Williams complained of foot pain and asked Schueler for diabetic shoes at his intake appointment. But it's undisputed that, as a nurse, Schueler lacked the authority to order Williams diabetic shoes. If Williams faults Schueler for not asking Fields to order diabetic shoes, there is no evidence that Schueler's failure to take that step delayed his receipt of diabetic shoes. Indeed, it's undisputed that Williams did not qualify for diabetic shoes at the visit with Fields on March 3, 2020. So Fields would have denied the request. Williams cannot show that Schueler's failure to ask Fields to

9

give him diabetic shoes harmed him. I will grant summary judgment to Schueler on Williams's federal medical care claim.

2. **Medical care claim against Fields**

Similar to his claim against Schueler, Williams is proceeding against Fields based on the allegations that, during the visit on March 3, 2020, Fields failed to act in response to his request for specially fitted shoes, and that his failure to receive those shoes contributed to the development of his toe wound. Dkt. 1 at 4; Dkt. 5 at 4.

But, again, it's undisputed that Williams did not qualify for diabetic shoes at the March 3 visit because he did not have any deformity, lesions, or open areas on either foot, and because his monofilament sensation was intact on both feet. The undisputed facts show that Fields declined to order diabetic shoes at the March 3 visit based on her medical judgment.

The undisputed facts also show that Fields provided Williams with considerable care for his diabetes and toe wound, including:

- Ordering petroleum jelly for his foot;
- Starting him on glipizide;
- Looking into whether he could be seen for custom orthotics;
- Ordering an X-ray, the antibiotic Keflex, and wound care;
- Directing nursing staff to apply collagen, antimicrobial dressing, and gauze wrap;
- Directing MPAA Rudack to expedite an appointment with an outside podiatrist;
- Ordering diabetic shoes, which Williams received three months after he arrived at DCI;
- Prescribing the antibiotic doxycycline;
- Ordering additional wound care;

10

- Increasing glipizide, and;

- Ordering diagnostic testing, weekly wound assessments, and a podiatry consultation.

This care, considered as a whole, shows that Fields took at least reasonable measures to treat Williams's diabetes and toe wound. *See Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000). Williams faults Fields for failing to ensure that he received diabetic shoes sooner, but the Eighth Amendment does not entitle him to the treatment of his choice. I will grant summary judgment to Fields on Williams's federal medical care claim against her.

### 3. Medical care claim against Kramer

Williams is proceeding against Kramer based on allegations that, in early September 2020, Kramer knew from both her evaluations of Williams and information received from nurses that his toe wound required more immediate action. *See* Dkt. 1 at 7–8; Dkt. 5 at 2–3, 5.

Again, Williams is not entitled to specific care or the best care possible. He is entitled to reasonable measures to address the risk posed by his diabetes and toe wound, and the undisputed facts show that Kramer provided that level of care. Tyler asked Kramer to evaluate Williams on September 3, 2020, and Kramer saw him that day. At that visit, Kramer provided several forms of treatment, including: (1) cleaning and dressing Williams's wound; (2) reordering his collagen matrix dressing; and (3) ordering dressing changes three times weekly for two weeks, daily blood pressure monitoring, blood glucose checks three times weekly, placement on the list for offsite appointments with podiatry and prosthetics, and Tylenol for pain. Kramer also asked Williams if he wanted to start insulin, though he declined that treatment.

11

A few days later, Nurse McCullen told Kramer that Williams's wound had digressed, and Kramer promptly acted by ordering: (1) daily wound dressing; (2) an offloading boot; (3) paring the callous; and (4) frequent podiatry visits.

Kramer provided additional care. The next day, Kramer saw Williams and: (1) ordered that the podiatry and prosthetics consultations be scheduled as high priorities; (2) examined his toe and cleaned and redressed the area; and (3) ordered that he change his dressing daily until he followed up with her five days later.

Williams says that, at this visit, Kramer ignored his statement that he feared losing a limb because the wound smelled foul and was causing him intense pain that had reached his groin. But that statement alone doesn't support an inference that Kramer thought that Williams would lose his toe if she did not take greater action, such as trying to expedite an appointment with the offsite podiatrist. Indeed, at the visit on September 14, 2020, Kramer noted that Williams's wound appeared to be improving.

And despite that impression, Kramer continued to vary Williams's treatment by: (1) prescribing Betadine twice daily; (2) lightly filling the wound with iodoform packing strips; (3) increasing the frequency of the dressing changes; and (4) ordering an offloading shoe. When Kramer learned that high priority podiatry appointments were not available, she reiterated to the MPAA that Williams needed to be seen by a podiatrist as soon as possible. The offsite podiatrist, Stroze, saw Williams just two days later. Stroze diagnosed Williams with osteomyelitis and his toe was quickly amputated, an unfortunate outcome. But the ample evidence that Kramer "responded reasonably to the risk [posed by his diabetes and toe wound], even if [s]he was ultimately unsuccessful in preventing the harm, negates an assertion of [conscious disregard against her]." *See Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483

12

(7th Cir. 2022). I will grant summary judgment to Kramer on Williams's federal medical care claim against her.

### 4. Medical care claim against Tyler

Williams is proceeding against Tyler based on allegations that, at the visit on September 3, 2020, Tyler failed to change his sordid wound dressing and told him to wear it for three days until Kramer saw him. Dkt. 5 at 4–5.

The undisputed facts contradict this claim. Tyler saw Williams the same day that he submitted an HSR in which he complained of foot and leg pain and asked to see a doctor. Tyler noted that the ulcer was swollen and had bloody drainage, and that Williams's blood pressure was elevated. Tyler didn't change Williams's dressing herself, but she asked Kramer to evaluate him. Kramer saw Williams that day and provided the care discussed above, which included cleaning and dressing his wound. Tyler did not ignore Williams's concerns or deny him care; she took prompt action to address those concerns by seeing Williams and notifying Kramer of his condition so that Kramer could provide more comprehensive care. I will grant summary judgment to Tyler on Williams's federal medical care claim.

## B. State-law medical negligence claim

Without a federal claim, the court would not have jurisdiction over Williams' state-law claim on the basis of diversity because he and defendants are Wisconsin citizens. *See* Dkt. 1 at 1–3.

When all federal claims have been dismissed, the general practice in federal court is to decline to exercise supplemental jurisdiction over the related state-law claims. *See Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). I'll follow that practice here

and relinquish jurisdiction over Williams's medical negligence claim without evaluating its merits.

Williams may pursue his medical negligence claim in state court, subject to Wisconsin statutes of limitations (and any other applicable procedural bars). Those limitations periods have been tolled while this case has been pending, but they will begin again 30 days from now. *See* 28 U.S.C. § 1367(d) ("The period of limitations for any claim asserted under [the court's supplemental jurisdiction] . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.").

ORDER

IT IS ORDERED that:

1. The state defendants' motion for summary judgment, Dkt. 36, is GRANTED.
2. Defendant Tyler's motion for summary judgment, Dkt. 34, is GRANTED.
3. Jurisdiction is relinquished over plaintiff's state-law medical negligence claim.
4. Defendant Kramer is to be recaptioned as "Jeanie M. Kramer."
5. The clerk of court is directed to enter judgment and close the case.

Entered September 22, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge